EMN:JDG/JMK
F.# 2011R01816

**M 11-1077**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

SEMYON BUMAGIN,

        Defendant.

- - - - - - - - - - - - - - - -X

<u>To Be Filed Under Seal</u>

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
<u>ARREST WARRANT</u>

(T. 18, U.S.C., §§
1951(a), 924(c)(1)(A)(i)
and 3551 <u>et seq</u>.)

EASTERN DISTRICT OF NEW YORK, SS:

    TRACIE A. RAZZAGONE, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    Upon information and belief, on or about and between August 1, 2011 and October 18, 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SEMYON BUMAGIN, together with others, did knowingly and intentionally conspire to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by robbery of watches and other jewelry from a warehouse. In furtherance of that crime of violence, the



defendant SEMYON BUMAGIN did knowingly and intentionally possess a firearm.

(Title 18, United States Code, Sections 1951(a), 924(c)(1)(A)(i) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the FBI since 2004. I am currently assigned to an FBI squad which investigates the illegal activities of Russian and Eurasian organized crime. As an FBI agent, I have participated in numerous investigations during the course of which I have conducted physical and electronic surveillance, executed court-authorized search warrants, reviewed consensual recordings of individuals, debriefed cooperating witnesses and confidential sources and used other investigative techniques to secure relevant information regarding criminal activities.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation; (b) reports made available to me by other law enforcement authorities; (c) discussions with other law enforcement agents involved in this investigation; and (d) my review of consensual recordings made by a confidential source.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

4. In or about August 2011, a confidential source ("CS")[1] advised agents of the FBI that he had encountered the defendant SEYMON BUMAGIN in Brooklyn, New York on a few occasions during that month.[2] The CS further advised that, during those meetings, BUMAGIN told the CS that he wanted to conduct a robbery

---

[1] The CS's information has been corroborated by, among other things, consensually monitored in-person and telephonic recordings, and physical surveillance. The CS is being financially compensated by the investigating agency for his assistance with this investigation. The CS has previously been convicted of securities fraud and possession of forged instruments.

[2] All the meetings between BUMAGIN and the CS occurred in Brooklyn, New York.

3

and sought the CS's assistance in doing so. BUMAGIN further told the CS that he had a gun to use in such a robbery.[3]

5. During their conversations in August 2011, the CS told BUMAGIN that the CS knew of a warehouse BUMAGIN and the CS could rob. The CS further told BUMAGIN that there were goods present in the warehouse from China. During one meeting with BUMAGIN, the CS showed BUMAGIN a photograph of the warehouse, which depicted a sign indicating that an export company occupied the warehouse.

6. On or about August 31, 2011, the CS met with BUMAGIN. The CS was equipped with a recording device and the meeting between BUMAGIN and the CS was consensually recorded. During the meeting, the CS reaffirmed to BUMAGIN that the CS knew of a warehouse BUMAGIN and the CS could rob. The CS suggested to BUMAGIN that he had a friend who worked at the warehouse. BUMAGIN asked CS whether there was cash inside. CS told BUMAGIN that there were watches in the warehouse worth approximately

---

[3] BUMAGIN and the CS had previously discussed participating in a robbery together. During August 2010, BUMAGIN told the CS that BUMAGIN had been in contact with an employee of a pawn shop in Brooklyn, New York, and that the employee had informed BUMAGIN that the owner of the pawn shop routinely traveled with sizeable quantities of gold jewelry. BUMAGIN also stated that the employee of the pawn shop provided this information to BUMAGIN to facilitate the robbery of the pawn shop owner. In discussing the potential robbery, BUMAGIN asked the CS if the CS could obtain a firearm with a silencer, and also suggested to the CS that violence might be needed to carry out the robbery. BUMAGIN told the CS that BUMAGIN was prepared to kill the owner of the pawn shop if necessary.

4

$500,000. BUMAGIN asked the CS about what kind of security was present at the warehouse, and suggested that the warehouse must have "[e]ighteen people over there."[4] The CS replied that he understood that while there were people at the warehouse during the day, only one security guard would be present at the warehouse at night. BUMAGIN replied, "this is better." BUMAGIN then asked the CS what kind of watches were stored in the warehouse. The CS replied that he thought there were Rolex watches in the warehouse. BUMAGIN said, "[w]e need to see it."

7. Later during the August 31, 2011 meeting, the CS asked BUMAGIN about the gun BUMAGIN had referred to in the earlier meeting. BUMAGIN told the CS that he had given that gun to another individual whom BUMAGIN said had been recently arrested, but BUMAGIN thought that the gun would still be available to them to use in the planned warehouse robbery.

8. On or about September 4, 2011, the CS met with BUMAGIN. This meeting was consensually recorded. BUMAGIN and the CS discussed the prospective robbery of the warehouse. BUMAGIN asked the CS if BUMAGIN could meet the CS's friend who worked in the warehouse. BUMAGIN also told the CS that BUMAGIN

---

[4] The quoted language herein is taken from consensually recorded conversations that were translated from Russian into English. These draft translations of the recordings are subject to revision.

was confident that he could obtain a gun for BUMAGIN and the CS to use in the robbery.

9. On or about September 6, 2011, the CS met with BUMAGIN. This meeting was consensually recorded. BUMAGIN told the CS that BUMAGIN would arrange for an individual to assist BUMAGIN and the CS in carrying out the robbery. BUMAGIN also confirmed that BUMAGIN would get a gun to use in the robbery.

10. BUMAGIN and the CS continued to discuss the planned robbery in subsequent meetings throughout September 2011. For example, BUMAGIN and the CS met on or about September 16, 2011. This meeting was not recorded. BUMAGIN suggested to the CS that BUMAGIN and the CS purchase a gun from an associate of BUMAGIN's ("UM-1") to use in the robbery. On or about September 18, 2011, the CS unexpectedly encountered UM-1 in the vicinity of Brighton Beach Avenue, in Brooklyn, New York. The meeting between the CS and UM-1 was not recorded. UM-1 confirmed to the CS that UM-1 planned to sell BUMAGIN and the CS a gun. UM-1 also told the CS that UM-1 had a shop that manufactured silencers. During telephone conversations on or about September 19, 2011, BUMAGIN and the CS agreed to purchase a gun and a silencer from UM-1. These telephone conversations were not recorded.

11. BUMAGIN and the CS continued to discuss the robbery plan in late September and early October 2011. During a consensually recorded meeting on or about September 28, 2011,

6

BUMAGIN told the CS that BUMAGIN had tried to contact UM-1 to follow up on their plan to purchase a gun from UM-1, but had been unsuccessful. On or about October 5, 2011, during a meeting which was not recorded, BUMAGIN told the CS that he was looking for alternative means to obtain a gun for use in the planned robbery of the warehouse. The CS showed BUMAGIN pictures of a safe that the CS told BUMAGIN was inside the warehouse and contained the watches. BUMAGIN and the CS also discussed robbing the warehouse at night.

      12. On or about October 14, 2011, BUMAGIN and the CS met, and the CS consensually recorded the meeting. BUMAGIN asked how old the security guard at the warehouse was and suggested using a "toy" - i.e., a fake gun - for the robbery. In response, the CS asked BUMAGIN what would happen if the guard had the "real thing" and BUMAGIN and the CS had to "return fire." BUMAGIN replied "[w]e're gonna haul ass." Later that day, BUMAGIN and the CS met again, but this meeting was not recorded. During that meeting, BUMAGIN told the CS that BUMAGIN had a gun, but that the gun did not have a magazine, or "clip," containing ammunition for the gun. BUMAGIN and the CS also met with another associate of BUMAGIN's ("CC-1"). CC-1 told BUMAGIN and the CS that CC-1 was willing to buy a gun in Florida in return for a portion of the profits from the robbery BUMAGIN and the CS were planning. BUMAGIN, CC-1 and the CS agreed to this plan.

7

13. On or about October 15, 2011, the CS again met with BUMAGIN in Brooklyn. The meeting was consensually recorded. BUMAGIN asked the CS whether BUMAGIN should give his gun to the CS. BUMAGIN further stated that CC-1 could get ammunition for BUMAGIN's gun while CC-1 was in Florida. Later that day, BUMAGIN and the CS met with CC-1 while driving in the CS's vehicle. BUMAGIN, CC-1 and the CS discussed CC-1 purchasing a gun as well as a magazine for BUMAGIN's gun:

>  CS: If you can get the clip and we don't fucking need to go anywhere that would be ideal of course. If you can get a piece, that would be great[,] too.
> 
>  BUMAGIN: He can't get a piece.
> 
>  CS: Can't? But you can get it done over there for sure? 100 percent? So that we don't fucking go there and burn money for nothing.
> 
>  CC-1: Of course[,] 100 percent.
> 
>  CS: 100 percent, right?
> 
>  CC-1: 100 percent.
> 
>  CS: We just need 200 dollars - the application costs. And that's it, right?
> 
>  CC-1: That's the cost of the -
> 
>  CS: Of the weapon, I got it. So the weapon will cost us about a thousand.
> 
>  CC-1: Yes.

8

The CS and BUMAGIN also explained the robbery plan to CC-1:

> CS: There is a job. Okay? In Long Island. We need to extract a safe from there.
>
> CC-1: Okay?
>
> CS: There's all sorts of bullshit in the safe[;] watches, gold. Ah, I'm not going to go into the details, but I'll explain it to you overall. It can be anywhere from 250 to 500 thousand dollars in there. . . .
>
> At night there is one guard there. . . . I have a guy that fucking works there. Okay? He gave me a lead about this bullshit a long time already . . . [w]e need a third man. The reason we need a third – if we're gonna haul away this safe –
>
> BUMAGIN: [CC-1], how much weight can you lift?
>
> CC-1: I don't know.
>
> BUMAGIN: Off the ground?
>
> CC-1: I don't know.
>
> CS: This [is] about [a] 500 [to] 600 pound safe. . . . We'll fucking need to put it on a dolly. And to lift it up on [a] ramp to the truck – to [a] [U-Haul] or a fucking van. So we need fucking – I think three people is, eh – is enough.

After BUMAGIN stepped away from the CS's car, the CS further explained the plan to CC-1:

> CS: Listen. Basically it's fucking watches, Rolex, Cartier, . . . gold, chains. . . . They're all

9

|        |                                                                                                                                                                                                                                                          |
|--------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|        | fucking hot. So the beauty of this fucking thing . . . there's not going to be any claims. The fucking owner, he's not gonna submit. You understand?                                                                                                     |
| CC-1:  | Uh-huh.                                                                                                                                                                                                                                                  |
| CS:    | . . . Basically, we just need to come in and take the fucking safe. The problem is[,] at night there's a fucking guard there. We'll get the key, the guy is gonna hook us up.                                                                            |
| CC-1:  | Uh-huh.                                                                                                                                                                                                                                                  |
| CS:    | You understand? I think that the two of us can lift the safe, but . . . we want a third man there so we don't get stuck. And we need a normal working weapon, just in case. Because we're gonna catch this guy by fucking surprise.                      |
| CC-1:  | [Unintelligible]                                                                                                                                                                                                                                         |
| CS:    | You understand?                                                                                                                                                                                                                                          |
| CC-1:  | Okay.                                                                                                                                                                                                                                                    |
| CS:    | You're down for something like this?                                                                                                                                                                                                                     |
| CC-1:  | Sure. Okay.                                                                                                                                                                                                                                              |

14. On or about October 16, 2011, BUMAGIN and the CS spoke by telephone. The telephone conversation was not recorded. BUMAGIN told the CS that BUMAGIN would give the CS his gun in exchange for $500. BUMAGIN also stated that he had ammunition for the gun.

10

15. BUMAGIN and the CS spoke again by telephone on or about October 17, 2011. The telephone call was not recorded. BUMAGIN and the CS agreed that the CS would give BUMAGIN $300 in exchange for BUMAGIN's gun. BUMAGIN and the CS agreed to meet near BUMAGIN's residence in Brooklyn, New York later that day. The meeting was consensually recorded. In addition, FBI agents, including your affiant, and members of the New York City Police Department ("NYPD"), conducted a surveillance of the meeting. The agents observed BUMAGIN and the CS meet in the CS's car for approximately a half hour. During the meeting, BUMAGIN gave the CS a box of .9 millimeter A-Merc ammunition but said that he misplaced the gun at his residence. BUMAGIN told the CS that he wanted to see the warehouse they were planning to rob. BUMAGIN said, "[y]ou have to take me there. I have to look at everything."

16. Later in the October 17, 2011 meeting, BUMAGIN told the CS that BUMAGIN wanted to meet the person that gave the CS the tip that there was a safe containing watches in the warehouse. BUMAGIN also suggested that he and the CS should "switch[] out" CC-1 for another associate of BUMAGIN's called "Boris," whom BUMAGIN referred to as strong. When the CS told BUMAGIN that the CS believed the two of them could lift the safe with the watches, BUMAGIN stated, "I started doing exercises at home." Later, BUMAGIN told the CS that they would need a dolly

to transport the safe onto the truck as well as a place to open the safe after they stole it. BUMAGIN further told the CS that he would find his gun.

17. Following the October 17, 2011 meeting with BUMAGIN, the CS provided the ammunition given to him by BUMAGIN to FBI agents. Later that night BUMAGIN called the CS by telephone and told the CS he had found the gun.

18. BUMAGIN and the CS next met on or about October 18, 2011. The meeting was consensually recorded, and FBI agents, including your affiant, and members of the NYPD surveilled the meeting. BUMAGIN and the CS were observed meeting in the CS's car for approximately 16 minutes. While in the CS's car, BUMAGIN gave the CS a .9 millimeter Hi-Point semi-automatic handgun in exchange for $300. Referring to the gun, BUMAGIN said to the CS, "[t]his is the real deal . . . And it's a nine-mil, that's fucking spectacular." Later in the conversation, BUMAGIN said to the CS, "let's pull a job together." The CS responded, "[y]ou've been talking about this for a hundred . . . years already." BUMAGIN then replied, "[s]o, why aren't you saying anything? Let's do it. We have the merchandise. That's it!"

19. After the CS met with BUMAGIN, the CS gave FBI agents the gun BUMAGIN had given to him.

20. Because public filing of this document could result in a risk of flight by the defendant, as well as

jeopardize the government's investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

WHEREFORE, your affiant respectfully requests that an arrest warrant be issued for the defendant SEMYON BUMAGIN so that he may be dealt with according to law.

Dated:   Brooklyn, New York
         November 1, 2011

_____
TRACIE A. RAZZAGONE
Special Agent, FBI

Sworn to before me this
1st day of November, 2011

_____
THE HONORABLE ANDREW L. CARTER
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK